STEPHEN J. WINDHORST, Judge.
| ¡Appellant, Suzaune McKamey, appeals the trial court’s judgment, rendered in accordance with the jury’s verdict, and the trial court’s denial of appellant’s motion for judgment notwithstanding the verdict (“JNOV”) and motion for new trial. For the reasons that follow, we affirm.
Facts and Procedural History
On February 6, 2008, appellant and her mother, Helen McKamey, were in a motor vehicle accident wherein appellant’s vehicle was rear-ended by a truck driven by Greg Carona.[1] The truck was owned by Lamont Murphy[2] and was insured by State Farm Automobile Insurance Company. Appellant filed a petition for damages contending that she sustained injuries as a result of the accident.
IsjDuring the trial on the merits, appellant’s case consisted primarily of appellant’s testimony and the testimony of numerous treating physicians she saw for her alleged injuries. The following testimony and evidence was elicited at trial.
Appellant testified that she was stopped at a red light and felt a “hard impact” when Mr. Carona’s truck rear-ended her vehicle. Her mother hit her head on the dashboard, but appellant did not hit anything inside the vehicle. She testified that she subsequently contacted her attorney before going to a doctor and she went to *453 see Dr. Norman Ott because her attorney referred her to him.
Appellant testified that she was in a prior accident in the mid-1990’s and had similar injuries but those injuries had resolved. She saw a chiropractor and orthopedist for the prior accident, but admitted that she did not use the same doctors for this accident. Appellant also testified that she did not have symptoms at the scene, but had symptoms hours after the accident.[3] She acknowledged that Dr. Ott’s records showed she denied radiating pain in her extremities for the first two visits with him and that her first recorded complaint of radiating pain occurred in August 2008, six months after the accident. Appellant testified she did not miss work and did not fill any of the prescriptions the doctors prescribed for her. She only took Advil or Aleve as needed. Appellant also testified that her hobbies include swing and ballroom dancing. Appellant admitted that all six of her video performances occurred after the February 6, 2008 accident. Appellant testified that the “Dancing with the Stars” video is not consistent with a typical performance performed by her; rather, her normal routines are more sedentary. Appellant testified she had increased pain after that particular performance. She admitted she | ¿did subsequently perform that same routine the following year and still had pain from the accident.
Appellant saw Dr. Ott[4] for the first time on March 14, 2008, over five weeks after the accident. Appellant informed Dr. Ott that she was in a prior motor vehicle accident approximately ten years ago wherein she sustained a neck injury that resolved. Appellant could not recall where she was treated, so Dr. Ott was not able to obtain her prior medical records to review. Dr. Ott relied on appellant’s statement that her prior injuries had resolved. Appellant complained of neck and left ankle pain and related her symptoms to the February 6, 2008 accident. During her first visit, appellant did not complain of radiating pain in her upper extremities and denied any back pain. Dr. Ott diagnosed appellant with post-traumatic headache, cervical/tra-pezius strain with spasm, lumbar strain and left ankle strain. Appellant again did not complain of radiating pain in her upper extremities and had no back complaints at her second visit on April 7, 2008.
Dr. Ott testified that appellant did not return until over four months later on August 22, 2008.[5] For the first time, on August 22, 2008, appellant complained of radiating pain in her upper extremities. Dr. Ott saw appellant for the last time on September 25, 2008, and appellant’s neck discomfort was improved and getting better.[6] Appellant’s ankle was tender with full range of motion and no pain with active maneuver. Dr. Ott recommended that appellant get an MRI and see an orthopedist. Appellant did not obtain a MRI, failed to return to see Dr. Ott, and Dr. Ott closed out his file.
*454 | BPrior to trial, Dr. Ott testified he reviewed appellant’s subsequent treatment, including an MRI taken in 2011. Dr. Ott observed two disc herniations at the C4-5 and C5-6 levels and a bulge at L4-5 level. However, Dr. Ott stated he “would leave these two up to the orthopedic specialist to talk about.” Dr. Ott testified that he does not like to use the terms “more likely than,” but he testified that based on her history and assuming there are no other intervening accidents or injuries, this accident could have produced her disc hernia-tions. However, Dr. Ott admitted that during his treatment of appellant he never diagnosed her with disc herniations or bulges.
On cross-examination, Dr. Ott acknowledged that 98% of his practice consists of plaintiffs in personal injury cases. Dr. Ott testified he knew appellant was a singer, actress, and entertainer, but he could not testify as to the physical requirements of her job. Dr. Ott also testified that although appellant said her ankle was tender, when he first examined her ankle, it was not swollen, and when he palpitated it, it did not reproduce the pain. Dr. Ott testified that you can get a cervical spasm numerous other ways besides being in a motor vehicle accident or from whiplash. While consistent with whiplash, a spasm is also consistent with degenerative disc disease or arthritis. Daily living, like dancing, can trigger a muscle spasm. Dr. Ott testified that in all likelihood, the bone spur and disc herniation at C5-6 were there prior to the accident. As for the C4-5 herniation, a person can have pain in the neck from a muscle spasm or from a muscle pull that is unrelated to a herniated disc, because you may not always know a herniated disc is there if it is asymptomatic. Dr. Ott also admitted the x-ray of appellant’s ankle, performed by his office, was normal which is consistent with the x-ray taken by Dr. David W. Aiken in 2011.
IfiNext, appellant saw Dr. Marc B. Kruse on June 2, 2009, over eight months after her last visit with Dr. Ott. Dr. Kruse[7] testified that on appellant’s first visit, she complained that her left and right trapezi-us were burning and cramping when she reached for something and she had some low back pain. Appellant also complained of neck and left ankle pain. Appellant did not report any headaches. Appellant told Dr. Kruse that she did not have any other similar or same accidents or injuries, only the February 6, 2008 accident.
Dr. Kruse testified that he observed objective findings of spasms along appellant’s trapezius muscle and some in her upper back. Trapezius spasms could be indicative of cervical disc injury or a muscle strain. Dr. Kruse diagnosed appellant with “cervical/thoracic lumbar, sacroiliac and metatarsal/tarsal joint dysfunction.” He did not diagnose appellant with disc herniations during her treatment. Dr. Kruse testified that he relied on appellant’s intake form and statements in making his diagnosis. Appellant told him her low back pain started with the date of the accident. He was not provided with Dr. Ott’s medical records. Dr. Kruse acknowledged that if Dr. Ott’s medical records provided that appellant’s low back pain began August 22, 2008, appellant’s version of facts to Dr. Kruse would be incorrect. Dr. Kruse testified he saw appellant approximately 15 times with the last visit on March 18, 2010. Dr. Kruse reported appellant’s condition as stable. Appellant failed to respond to treatment and Dr. Kruse referred her to Mary Donker, a massage therapist, and recommended appellant go see an orthopedist.
*455 Dr. Kruse also testified he could not give appellant an impairment rating because she has not been stable for 12 months. However, if appellant’s future physical therapy did not work and she stayed exactly the same as today, her 17impairment would be somewhere around 10-16%, not including her ankle because he doesn’t treat ankles.
Dr. Kruse testified that he last saw appellant for treatment on July 12, 2013, a week before trial, but appellant was not under his care because there was a large gap in treatment.[8] Dr. Kruse further testified he did not diagnose appellant with disc herniations until after his review of her 2011 MRI report during appellant’s July 12, 2013 visit. Dr. Kruse testified that more likely than not appellant’s injuries were caused by or made symptomatic by the February 6, 2008 accident. He testified, however, that he could not state whether the disc herniations occurred at the time of the accident. Dr. Kruse admitted that at no time during his treatment of appellant, ie., June 2, 2009 to March 18, 2010, did he believe that appellant’s pain was related to a disc herniation. He also admitted it is possible that appellant’s her-niations occurred during the large gap in her treatment with him and the MRI or could have been caused by his treatment of appellant.
Appellant next saw Dr. James Todd, an orthopedist, on April 29, 2010.[9] Dr. Todd’s medical report stated that appellant did not remember the month or year of the accident and she denied any prior medical history. Appellant had full range of motion in her cervical spine with no tenderness and no spasms. Both shoulders were examined and demonstrated full range of motion and no weakness. Dr. Todd’s medical report also stated that appellant’s upper extremities were intact and there was not any pain. Appellant further demonstrated a full range of motion of her lumbar spine. Dr. Todd assessed her “with having muscular neck and low back pain as well as left ankle pain. No etiologies were detected, as the exam was essentially benign.” Appellant returned to see Dr. Todd on June 2, 2010, and he | ^reported that his examination was unchanged and he did not detect any new findings. In his medical report, Dr. Todd noted that appellant was having persistent neck pain, low back pain, and left ankle pain. However, he noted that “The etiology of these is unclear.” When Dr. Todd saw appellant on October 28, 2010, appellant’s range of motion in her neck was fine with no spasms, no neurological deficits, good shoulder motion, no instability, no impingement, no rotator cuff weakness, and her left ankle was benign. His examination of her low back was unremarkable. Dr. Todd’s medical report does not indicate that he saw any spasm or a problem with appellant’s lordotic curve. His assessment was that appellant had non-specific pain and weakness. Dr. Todd concluded his medical report by stating “I cannot find an anatomical or clinical cause for these symptoms.”
Dr. Joshua Kaufman testified he first saw appellant on June 23, 2011.[10] He was informed appellant was in a motor vehicle accident and she had pain in her left ankle, neck, back and right upper trapezius. On examination, appellant had a decreased range of motion in her cervical spine and *456 discomfort at her right upper trapezius. Dr. Kaufman diagnosed her with disc her-niations at C4-5 and C5-6 and referred appellant to Dr. Paul Hubbell, III. Dr. Kaufman testified that appellant’s complaints were consistent with the 2011 MRI report. Dr. Kaufman testified that more likely than not appellant’s injuries, treatment and future procedures were caused by and related to the February 6, 2008 accident.
On cross-examination, Dr. Kaufman testified that he only saw appellant two times. Appellant’s initial visit was on June 23, 2011, and he saw her a week before trial on July 10, 2013. Dr. Kaufman acknowledged that appellant had a large gap in treatment between her last visit with Dr. Todd on October 28, 2010, and her first j civisit with him on June 23, 2011. Dr. Kaufman did not agree with Dr. Todd’s assessment of appellant’s condition nor Dr. Hubbell’s diagnosis of spondylosis, degenerative disc disease and facet pain. Dr. Kaufmann also admitted he did not attribute appellant’s ankle pain to the accident; rather in his medical records he attributed appellant’s ankle pain to her slight leg discrepancy. His medical records provided that appellant had “left ankle pain of unclear etiology,” but “with possible component attributed to mild leg length discrepancy.”
Dr. Paul Hubbell first saw appellant in April 2012, over four years after the February 6, 2008 accident.[11] Dr. Hubbell is not an orthopedic surgeon, neurosurgeon, or radiologist. Dr. Hubbell testified he diagnosed appellant with “cervical spondy-losis without myeolopathy” and appellant did not have radicular symptoms. Appellant also had a “herniated cervical disc at two levels with radiculitis.” Dr. Hubbell testified that more likely than not appellant’s injuries were related to the February 6, 2008 accident and the treatment given by him was medically necessary. Unlike appellant’s prior treating physicians, Dr. Hubbell did not think it was necessary to refer appellant to an orthopedist. Dr. Hubbell performed a Cervical Facet Median Block at the C4-5 and C5-6 levels on July 23, 2012. The next procedure he performed was a Radio Frequency Ablation at C4-5, C5-6, and C6-7, which was not diagnosed as a problem area by any other doctor. Dr. Hubbell testified appellant would need two more Radio Frequency Ablations in the future and she would also need a third procedure called a Cervical Transforaminal Epidural Injection.
On cross-examination, Dr. Hubbell acknowledged he had an ownership interest in Jefferson Ambulatory Surgery Center where appellant had the two procedures performed and thus, he was essentially sending himself business. HeJ^also testified that the cause of appellant’s pain was her facet joints. Dr. Hubbell acknowledged that the 2011 MRI report and all of appellant’s other medical reports do not mention anything about facets. Dr. Hub-bell also admitted appellant did not refer to any low back pain in her drawing, and that he did not diagnose appellant’s ankle because she had full range of motion and no swelling in her ankle.
Appellant informed Dr. Hubbell that her pain prevented her “from participating in more energetic activities, i.e., sports and dancing.” Even though he was informed that appellant continued to dance and entertain professionally, Dr. Hubbell testified that based on appellant’s answer, her pain was a problem when she was dancing socially, but not while she was dancing professionally. Dr. Hubbell acknowledged that any activity that involved appellant *457 extending her neck or stretching her arm or twisting would aggravate appellant’s pain.
Dr. Aiken saw appellant on January 18, 2011, almost three years after the accident. Dr. Aiken was qualified as an expert in the field of orthopedic surgery. Appellant complained of headaches, neck pain, low back pain, and left ankle pain. Dr. Aiken performed an orthopedic examination. Appellant’s neck had no tenderness, no muscle spasm, full range of motion and no pain with axial compression. Appellant had no weakness of muscles in her arms, no sensory loss to light touch or pinprick in either upper extremity, normal reflexes in both upper extremities, and had full and painless range of motion of her shoulders. Although appellant complained of low back pain, she had a normal MRI, normal x-ray, and a normal examination. Examination of appellant’s ankle was also normal. X-rays of her ankle showed a decrease in joint space and mild arthritis that would cause pain from time to time. Appellant’s entire physical exam was normal even though she |nwas saying that she was in constant pain. Dr. Aiken testified that pain is a subjective complaint and he could not tell whether appellant had pain or not.
Dr. Aiken also testified that he looked at appellant’s x-rays. The x-rays showed a bone spur that indicated that she had disc degeneration in her neck over the last five to ten years. A bone spur takes a long time to grow and is a sign of disc degeneration at C5-6. This would cause pain a couple times a week. He then looked at appellant’s 2011 MRI and found that appellant did have a ruptured disc in her neck at C5-6 and two discs showed age-related changes, some of which pre-existed this accident. While appellant had a ruptured disc in her neck, by the time he saw her she was doing pretty well, and looked like she was recovering. Dr. Aiken testified that it is necessary to look at both MRIs and x-rays when conducting an orthopedic examination. MRIs do not show bone as well as x-rays whereas MRIs do show a rupture of a disc better than x-rays.
Dr. Aiken testified that there is no way to tell if the disc at C5-6 was fully herniated prior to the accident. He could only state that the disc ruptured prior to the date of the MRI in January 2011. Dr. Aiken testified that he goes by when a patient reports arm pain to ascertain when a rupture occurred. In this case, appellant first reported arm pain in August 2008. In Dr. Aiken’s opinion, the evidence suggests that the disc herniation at C5-6 occurred around August 2008.
Dr. Aiken testified he is familiar with Dr. Todd’s work as an orthopedist. Dr. Todd’s examinations of appellant’s neck were negative or benign and were consistent with his examination of appellant’s neck. Also, in all medical probability, if appellant’s ankle had no swelling, then this accident would not have caused an inflammation of that arthritic space. Dr. Aiken agreed with Dr. Kaufman that Dr. Hub-bell’s assessment of appellant is incorrect. Looking at the MRI report, there is no mention of any abnormality of appellant’s facet joints. |12Appellant’s facet joints are normal on the MRI and the x-rays and thus, there was no reason for Dr. Hubbell to perform the Radio Frequency Ablations. He saw all six videos of appellant singing and dancing. Appellant had full range of motion on all the videos, but especially on the “Dancing with the Stars” video. Dr. Aiken testified that if an individual has a ruptured disc, “they’re not going to throw their head back. They’re not going to turn their neck suddenly to one side.” Dr. Aiken testified that appellant throws her head back in the “Dancing with the Stars” *458 video, which she would not be able to do with a symptomatic ruptured disc.
When asked if in all medical probability whether appellant sustained a low back injury as a result of the accident, Dr. Aiken testified he found no objective evidence of an injury when he saw appellant two years post-accident. If appellant sustained a muscle pull or aggravated her pre-existing arthritic condition rendering it painful, it would have become apparent immediately after the accident and not a week or more later. Also, if appellant injured her disc in this accident, he would have expected there to be radicular type complaints with burning in her arms well before six months after the accident. Dr. Aiken testified that in all medical probability, given that the spur and unstable disc were present prior to the accident, they would have caused pain to appellant’s neck prior to the accident.
Dr. Aiken testified that appellant did not have a herniation at C4-5. Appellant did have dehydration and bulging of the disc at C4-5, which is a normal, age-related change. Disc bulging does not cause pain unless it gets very large. He opined that the disc bulging in appellant was not large enough to cause pain; it was just part of the aging process. Dr. Aiken testified that the other doctors who examined appellant were not spinal specialists, like he is.
After four days of testimony, a twelve-person jury found Mr. Carona was liable for the accident, but found appellant did not sustain any injuries as a result of 11sthe accident. Appellant filed a motion for JNOV, or alternatively, a motion for new trial. The trial court denied appellant’s motions and this appeal followed.
Discussion
An appellate court may not set aside a trier of fact’s finding in the absence of manifest error. Arabie v. CITGO Petroleum, 10-2605 (La.3/13/12), 89 So.3d 307, 312, citing Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Arceneaux v.. Domingue, 365 So.2d 1330, 1333 (La.1979). When there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880, 883 (La.1993); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel its own evaluations are as reasonable. Ro-seU) 549 So.2d at 844. Credibility determinations, including evaluating expert witness testimony, are for the trier of fact. Sportsman Store of Lake Charles, Inc. v. Sonitrol Security Systems of Calcasieu, Inc., 99-0201 (La.10/19/99), 748 So.2d 417, 421. The trial court is in a better position to evaluate live witnesses, as compared with the appellate court’s access to a cold record. Guillory v. Lee, 09-0075 (La.6/26/09), 16 So.3d 1104, 1117. Thus, if the trier of fact’s findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse. Sistler, 558 So.2d at 1112.
In a personal injury case, the ' plaintiff bears the burden of proving a causal relationship between the injury sustained and the accident which caused the injury. American Motorist Insurance Co. v. American Rent-All, Inc., 579 So.2d 429, 433 (La.1991). Also, a tortfeasor takes his victim as he finds him and when a 114defendant’s tortious conduct aggravates a pre-existing condition, the defendant must compensate the victim for the full extent of the aggravation. Lasha v.. Olin Corp., 625 So.2d 1002, 1005-1006 (La.1993). A plaintiff must prove causation by a preponderance of the evidence. Morris *459 v. Orleans Parish School Bd., 553 So.2d 427, 430 (La.1989). The test for determining the causal relationship between the accident and subsequent injury is whether the plaintiff proved through medical testimony that it is more probable than not the subsequent injuries were caused by the accident. Mart v. Hill, 505 So.2d 1120, 1128 (La.1987). Whether an accident caused a person’s injuries is a question of fact which should not be reversed on appeal absent manifest error. Housley v. Cerise, 579 So.2d 973, 979 (La.1991); See also, Martin v. East Jefferson General Hosp., 582 So.2d 1272, 1276 (La.1991); Smith v. State through Dept. of Health and Human Resources Admin., 523 So.2d 815, 822 (La.1988).
JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. Lastrapes v. Progressive Sec. Ins. Co., 10-0051 (La.11/30/10), 51 So.3d 659, 662, citing Joseph v. Broussard Rice Mill, Inc., 00-0628 (La.10/30/00), 772 So.2d 94, 99; Forbes v. Cockerham, 08-762, 08-770 (La.1/21/09), 5 So.3d 839, 857; Willis v. Meilleur, 11-705 (La.App. 5 Cir. 5/31/12), 96 So.3d 1259, 1272. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach difference conclusions. Joseph, 772 So.2d at 99. In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the nomjmoving15 party. Anderson v. New Orleans Public Service, 583 So.2d 829 (La.1991).
The granting or denying of a motion for new trial is within the discretion of the trial court. Davis v. Witt, 02-3102, 02-3110 (La.7/2/03), 851 So.2d 1119, 1130. In Davis, the court explained:
The fact that a determination on a motion for new trial involves judicial discretion, however, does not imply that the trial court can freely interfere with any verdict with which it disagrees. The discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury’s responsibility. Id., citing Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2 Cir.1991).
In a motion for new trial, the trial court may evaluate the evidence without favoring either party; it may draw its own inferences and conclusions; and evaluate witness credibility to determine whether the jury had erred in giving too much credence to an unreliable witness. Joseph, 772 So.2d at 104. The applicable standard of review is whether the trial court abused its discretion. Id.
In her first assignment of error, appellant contends that there was overwhelming evidence that her injuries were caused by the February 6, 2008 accident, and the jury erred in finding appellant did not suffer any damages. In her second assignment of error, appellant contends that the trial court abused its discretion and committed legal error by declining to grant appellant’s motion for JNOV, or alternatively, motion for new trial, where there was overwhelming evidence that appellant was injured in the February 6, 2008 motor vehicle accident.
Appellant contends the testimony and medical evidence established that she had *460 two cervical disc herniations at the C4-5 and C5-6 levels, a disc bulge at L4-5, |1fiand ongoing pain, discomfort and injury to her ankle[12] and that these injuries were related to and sustained as a result of the accident. Appellant further contends that because she was in good health for ten years prior to this accident she is entitled to the “Housley presumption.” [13]
Appellant also claims the jury’s failure to find that her injuries were causally related to the accident was error, and the trial court should have corrected this error by granting her motion for JNOV or motion for new trial. Appellant argues that the facts and inferences point so strongly in favor of the appellant, reasonable jurors could not arrive at the conclusion that appellant did not suffer any injuries in the accident. Thus, appellant contends the trial court was manifestly erroneous in declining to grant her motion for JNOV. At a minimum, appellant argues the trial court should have granted her motion for new trial because the medical testimony presented by appellees failed to contradict the appellant’s claims that her injuries were causally related to the accident.
Based on our review of the record, we disagree. The jury’s determination that appellant did not sustain any injuries as a result of the accident is entitled to great deference on appeal and is supported by a reasonable factual basis in the record. We find that the jury was not manifestly erroneous in finding appellant’s injuries were not causally connected to this accident. Accordingly, we further find that the trial court did not err in denying appellant’s motions.
The jury heard testimony from appellant’s appraiser concerning the amount of damage and saw photographs of the minor damage to appellant’s vehicle. Appellant testified she did not seek medical treatment until five weeks after the accident, and only sought treatment after speaking with her attorney, who referred |17her to Dr. Ott. Also, appellant’s testimony that she experienced pain the same day of the accident was contradicted by the testimony and medical records. Additionally, appellant was not diagnosed with two disc herni-ations and a bulge until 2011, almost three years after this accident. Furthermore, appellant continued to work and the jury was shown videos taken after the accident wherein appellant is singing, dancing, and entertaining in a manner inconsistent with her alleged complaints of injuries.
The jury heard additional testimony and evidence to support a reasonable factual basis to conclude appellant’s injuries were not related to the accident. First, appellant did not disclose her previous motor vehicle accident and injuries to all of her treating physicians. Second, appellant did not inform Dr. Kruse that the radiating pain in her arms began in August 2008, six months after the accident, as supported by Dr. Ott’s medical records. Third, appellant’s treating physicians diagnosed appellant differently and no physician diagnosed appellant with a disc herniation or bulge until after her MRI in 2011, almost three years after this accident. Fourth, appellant claimed she was in good health for ten years prior to the accident, but the evidence and testimony suggested that appellant was not in good health prior to the accident.[14] Fifth, appellant had many *461 large gaps in her medical treatment, starting with a gap of five weeks between the accident and her first visit with Dr. Ott. Sixth, appellant continued to work the entire time she argued she was hurt and in pain; yet none of her doctors knew the physical requirements of her job or viewed her performances. Seventh, the jury heard testimony that the injuries appellant complained about could be from trauma caused by daily living, including dancing, which appellant continued to do after the [ 1saccident. Finally, the testimony and evidence showed the accident did not aggravate appellant’s pre-existing condition.
Based on the testimony and evidence, including the videos, the jury obviously had credibility issues with appellant and her witnesses. Appellant’s own orthope.dist, Dr. Todd, who appellant did not call to testify, and Dr. Aiken, an orthopedic surgeon, each performed orthopedic examinations which were negative or benign. Dr. Aiken testified that the evidence suggested appellant’s disc herniation occurred around the time appellant experienced radiating arm pain which was first reported in August 2008. Neither orthopedist found appellant’s injuries were causally related to this accident. Dr. Todd and Dr. Aiken’s credibility as spinal specialists obviously carried more weight with the jury and played a role in the jury’s determination that appellant’s injuries were not causally related to the accident. Accordingly, we find appellant’s arguments are without merit.
In her third assignment of error, appellant contends that the trial court mismanaged the trial schedule and posed an undue hardship on the jury by requiring them to begin deliberation at 9:00 P.M. on a Friday night after a four-day trial, as well as other time management issues, resulting in legal error.
Appellant contends the trial court took testimony and evidence on Monday, Tuesday, and Wednesday, skipped Thursday to handle unrelated matters, and then reconvened on Friday. The trial concluded at approximately 9:00 P.M. on Friday and the jury was instructed to deliberate into the early morning hours of Saturday.[15] Appellant contends that the jury realized that if they were to find appellant did not have any injuries related to the accident they could go home. The early arrival Intime each day and the late evenings were exhausting to the jurors, and this fatigue influenced the jury’s consideration of appellant’s claims. Appellant claims that because the jury was forced to deliberate after normal working hours immediately following a lengthy trial, they were pushed beyond their reasonable limits which resulted in a verdict against appellant. Appellant contends that had the trial court not mismanaged the trial schedule, the jury would not have acted so unreasonably.
An appellate court must render its judgment upon the record on appeal. La. C.C.P. art. 2164. The record on appeal is that which is sent by the trial court to the appellate court and includes pleadings, court minutes, transcripts, jury instructions, judgments, and other rulings, unless otherwise designated. La. C.C.P. art. 2128; Jones v. Jones, 09-757 (La.App. 5 Cir. 12/29/09), 30 So.3d 137, 139, citing Reed v. Peoples State Bank of Many, 36,-531 (La.App. 2 Cir. 3/5/03), 839 So.2d 955, 958. Appellate briefs of the parties are not part of the record on appeal, and this *462 Court has no-authority to consider facts referred to in appellate briefs if they are not in the record that is lodged in the appellate court. Jones, 30 So.3d at 139, citing Austin v. State Farm Ins. Co., 06-808 (La.App. 5 Cir. 3/13/07), 956 So.2d 13, 15, writ denied, 07-0761 (La.6/1/07), 957 So.2d 178.
We find the record does not support appellant’s allegations that the jurors were tired or forced to continue deliberations or that the trial court mismanaged the trial. Furthermore, counsel for appellant did not object to the trial court’s management of the trial, including the late deliberation of the jury on Friday night. In fact, the record shows that appellant’s counsel was satisfied and acquiesced with the trial court’s management of the trial.[16] Accordingly, appellant’s argument is not properly before us on appeal.
120In-- her fourth assignment of error, appellant contends the trial court abused its discretion and committed legal error in assessing all costs against appellant.
Appellant contends that since she prevailed on the issue of liability, all costs should have been assessed against appel-lees. Even if the jury found appellant did not suffer any injuries, appellant contends that it was not equitable for the trial court to deny costs to appellant because each medical visit undertaken was done in good faith and recommended by medical professionals who ordered the treatment.
The trial court may assess costs in any equitable manner and its assessment will not be reversed on appeal in the absence of an abuse of discretion. Hartz v. Indovina, 09-967 (La.App. 5 Cir. 4/27/10), 40 So.3d 253, 257, writ denied, 10-1222 (La.9/17/10), 45 So.3d 1050. La. C.C.P. art. 1920 provides that “costs shall be paid by the party cast.”
The jury found that although Mr. Caro-na was liable for the accident, appellant did not sustain her burden of proving that her injuries were causally connected to the accident.[17] Considering the circumstances of this case, we find the trial court did not abuse its discretion in assessing all costs to appellant.
In her fifth assignment of error, appellant contends the trial court committed legal error by declining to allow appellant to introduce evidence showing that appellees paid appellant’s property damage.
Appellant contends the trial court erred in declining to. allow the admission of evidence of the appellees’ payment for damages to appellant’s vehicle. Appellant also argues the trial court incorrectly held that the payment was a settlement when the payment was tendered without any conditions.
liuThe admissibility of evidence of compromise, settlement and tender is determined by La. C.E. arts. 408, 409, 411, *463 and 413. Calcagno v. Gonzales, 99-287 (La.App. 5 Cir. 10/13/99), 802 So.2d 643, 644. La. C.E. art. 413 provides that “Any amount paid in settlement or by tender shall not be admitted into evidence unless the failure to make a settlement or tender is an issue in the case.” (Emphasis added). The check for damages was identified by appellant as an unconditional tender. We find that the trial court did not err in correctly refusing to admit the unconditional tender into evidence. Even assuming the trial court incorrectly refused to admit the check into evidence, this exclusion would be harmless error. The jury heard testimony from appellant and appellant’s expert appraiser as to the extent of the damage as well as saw photographs of the damage to the vehicle. Appellant was not prejudiced by the exclusion of the evidence.
Conclusion
For the reasons stated above, we affirm. All costs are assessed against appellant.
AFFIRMED.

. After appellant rested her case, appellees moved for and the trial court granted a motion for involuntary dismissal on behalf of Greg Carona dismissing him with prejudice. The parties did not appeal this issue. The parties also did not appeal the jury's finding that Mr. Carona was liable for the accident. Thus, a determination of fault is not considered in this appeal.

. After appellant rested her case, appellees moved for and the trial court granted a motion for directed verdict on behalf of Lamont Murphy, individually, dismissing him with prejudice. The parties did not appeal this issue.

. Donald Rees, appellant’s fiance, testified that appellant’s condition did not immediately change after the accident; rather, she "eventually” began feeling pain. When questioned as to whether her "Dancing with the Stars” performance increased appellant’s pain, Mr. Rees answered, "No.”

. Dr. Ott was qualified as an expert in the field of internal medicine.

. Appellant attributed the large gap in treatment to attending a family reunion that was out-of-state and taking care of her mother. Appellant also admitted that she did not immediately go back to see Dr. Ott when she returned to Louisiana.

. Appellant attended approximately 11 sessions of physical therapy between March 14, 2008 and September 25, 2008.

. Dr. Kruse was qualified as an “expert in chiropractic.”

. Dr. Kruse did not treat appellant from March 18, 2010 to July 12, 2013, a gap in excess of two years.

. The parties stipulated that Dr. Todd was unavailable to testify.

. Dr. Kaufman was qualified as an expert in the field of physical medicine and rehabilitation.

. Dr. Hubbell was qualified as an expert in the field of interventional pain management.

.Appellant consistently refers in briefs to her right ankle. However, we note that the evidence and testimony established that appellant allegedly injured her left ankle.

. Housley v. Cerise, 579 So.2d 973, 979 (La.1991).

. The jury was given instructions on the Housley presumption and found a lack of causation. Whether the plaintiff was entitled *461 to the Housley presumption is a factual issue subject to manifest error. Detraz v. Lee, OS-1263 (La. 1/17/07), 950 So.2d 557, 561.

. We note that the jury reconvened at 11:47 P.M. with a verdict, and was released at 11:55 P.M. The jury did not go into the early morning hours on Saturday.

. On the third day of trial, this discussion regarding time management occurred: MR. VARRECHIO: I just hope he gets told this is a problem—not a problem, but assuming five or six o’clock Friday comes, and we're not done or they start deliberating and they don't finish, do we stay until they are finished or do you—
THE COURT: We stay until they are finished.
MR. VARRECHIO: Okay. Okay.
THE COURT: Yea. Yea. We are going to be done.
MR. VARRECHIO: Okay. That's fine with me. I’m happy with that.

. Additionally, the trial court granted appel-lees' motion for directed verdict and motion for involuntary dismissal and dismissed with . prejudice defendants, Mr. Murphy and Mr. Carona.